OPINION
On March 26, 1998, Wallick Enterprises, Inc. ("Wallick") filed a complaint in the Franklin County Court of Common Pleas against the Lorain Metropolitan Housing Authority ("LMHA") and William Neal, individually. Wallick, an Arizona corporation with an office in Reynoldsburg, Ohio, and LMHA had entered into a turnkey contract of sale for the construction and sale of public housing projects located in Lorain and Elyria, Ohio. The contract also called for the issuance of a letter of credit to assure Wallick's construction obligations. Wallick claimed that LMHA breached the letter of credit and contract by calling the letter of credit in December 1997 when there had been no breach by Wallick. Wallick also set forth a claim against William Neal, executive director of LMHA, for, in essence, defamation.
LMHA and Mr. Neal filed an answer, and LMHA filed a counterclaim for breach of contract for Wallick's alleged failure to make repairs due to faulty materials and poor workmanship. Summary judgment was granted in favor of Mr. Neal, and the claim against him was dismissed. The case was referred to a magistrate for a jury-waived trial.
On February 1, 2000, the magistrate issued an amended decision with findings of fact and conclusions of law. The magistrate determined that Wallick had breached the contract by failing to promptly remedy defects in the construction and that LMHA was entitled to demand payment under the letter of credit. The magistrate concluded that LMHA was entitled to judgment in the amount of $328,000 with a setoff of $109,012, which was the amount LMHA received under the letter of credit (for a total judgment of $218,988).
Wallick filed objections to the magistrate's decision and a motion for an extension of time to supplement the objections with a trial transcript, which was not yet ready. On April 30, 2000, the trial court rendered a decision denying Wallick's motion for an extension and overruling Wallick's objections to the magistrate's decision. A judgment entry was journalized on May 1, 2000.
Wallick appealed to this court. On March 6, 2001, we reversed on the basis the trial court should have allowed the extension of time and should have reviewed the transcript when ruling on Wallick's objections.
Upon remand, Wallick filed new objections to the magistrate's decision. On November 6, 2001, the trial court rendered a decision and entry overruling the objections and adopting the magistrate's decision in favor of LMHA.
Wallick (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
"First Assignment of Error
"The conclusion of the Trial Court that Appellant committed a breach of the Contract between the Parties causing damage to Appellee in the amount of $328,000.00 is unsupported by the e vidence at trial.
"Second Assignment of Error
"The conclusion by the Court below that Appellant breached the Contract between the Parties entitling Appellee to call the letter of credit furnished by Appellant is against the manifest weight of the evidence[.]"
In its first assignment of error, appellant contends, in essence, that the trial court's judgment as to breach of contract was against the manifest weight of the evidence. In reviewing the evidence, we are guided by the presumption that the findings of the trier of fact were correct, as the trier of fact is best able to view the witnesses and to use such observations in weighing the credibility of the proffered testimony. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. Hence, if competent and credible evidence exists to support the findings and conclusions of the trier of fact, an appellate court should not substitute its judgment for that of the trial court. Seasons Coal at 80.
The trial court adopted the magistrate's decision which concluded that appellant had breached the contract by failing to promptly remedy defects due to faulty materials and workmanship. Much of the evidence as to faulty workmanship went to problems with the vinyl siding used on the project. We note that appellant does not actually argue that there were no problems with the vinyl siding. Instead, appellant contends that judgment against it was improper because, among other things, it had no notice of defects in the siding until the nine-month inspection in October 1997, it did not timely receive the punch list generated from the nine-month inspection which set forth the items in need of repair, and the evidence as to "heat trap," one of the alleged causes of the siding problems, was insufficient. For the reasons that follow, however, we determine there was sufficient competent, credible evidence that appellant breached the contract by failing to repair defects due to poor workmanship and faulty materials.
There was sufficient evidence that appellant did not perform in a workmanlike manner in regard to installation of the vinyl siding and that appellant failed to repair and/or timely repair the problems arising therefrom. The problems that occurred with the vinyl siding stemmed from a variety of factors such as improper nailing, panels being cut improperly, and heat trap. As to heat trap, there was testimony that this occurs when vinyl siding is placed over foil-faced insulation, which was the construction method used in the case at bar. Ultraviolet rays penetrate the siding, bounce off the insulation and back onto the siding, thus causing excessive heat. This heat then causes the siding to warp and distort and, once warped, the siding will not go back to its original form.
Appellant did not present evidence that heat trap had not occurred here. Rather, appellant contends there was conflicting testimony as to whether or not placing vinyl siding over foil-faced insulation was customary in the industry. David Wozny, a district sales representative of Royal Building Products ("Royal"), the company that manufactured the vinyl siding used in the project, testified on behalf of LMHA ("appellee"). Mr. Wozny inspected sites on the project and testified that he found numerous problems with the siding installation. Mr. Wozny testified that some nails were too tight, siding was cut incorrectly, and heat trap had occurred. As to heat trap, he testified that it was not customary or usual practice to use foil-backed insulation with vinyl siding and that this practice was highly not recommended by his company.
Appellant's witness, George Berardi, a registered architect who had designed the project on behalf of appellant, testified that he disagreed with Mr. Wozny's statement that it was not customary to use foil-faced insulation with vinyl siding. Mr. Berardi believed that the use of siding with the substrate material he specified complied with HUD requirements. Mr. Berardi had not specified the use of siding manufactured by Royal, which was ultimately furnished. Mr. Berardi testified that Royal siding was very similar to many other siding products. Mr. Berardi had not seen anything in manufacturers' literature recommending against the use of vinyl siding with a foil substrate material.
Obviously, there was conflicting testimony as to whether or not it was customary to use vinyl siding with foil-faced insulation. However, this court is not in a position to judge the credibility of the witnesses or to second-guess the trial court's determinations in this regard. There was sufficient competent, credible evidence that use of vinyl siding over foil-faced insulation was not customary. More importantly, however, the evidence shows that heat trap had indeed occurred and had caused damage to some of the siding on the project. In addition, there was evidence of faulty workmanship as described above. The faulty materials and poor workmanship resulted in a variety of problems with the siding. The evidence shows that while appellant attempted to correct the problems prior to expiration of the warranty period, problems still existed at the time of trial.
Hence, there was more than sufficient evidence of breach. In addition, there was sufficient competent, credible evidence to support the damages award. The $328,000 figure was based on the cost of removing the siding and insulation on 40 units and replacing both. The evidence shows that the heat trap phenomenon had affected and would continue to affect the siding on the units and, thus, replacement was necessary. For example, appellant's own witness, Alex Knight, a siding contractor, testified that he observed numerous problems with siding in October 1999, two years after the nine-month inspection. These problems did not necessarily appear on the October 1997 punch list generated from the nine-month inspection. This supports other testimony that indicated heat trap was causing bulging and warping and that the siding problem was progressive. Added to this was the other evidence regarding improper installation of the siding itself (for example, the nailing and cutting of the siding). Thus, there was sufficient evidence supporting the damages award.
In summary, there was sufficient evidence supporting a finding that appellant was in breach of contract due to faulty materials and poor workmanship and that the damages award was proper. None of appellant's arguments in support of this assignment of error assuages their default under the contract. Hence, judgment in favor of appellee on breach of contract issues was proper.
Accordingly, appellant's first assignment of error is overruled.
In its second assignment of error, appellant contends the trial court erred in finding appellee was entitled to call the letter of credit. Appellant asserts that appellee improperly called the letter of credit in December 1997 because at this point in time, appellant was not in default under the contract. Further, appellant contends it was given no prior notice that appellee would be calling the letter of credit and that during the warranty period, the parties had agreed to a time for making repairs. For the reasons that follow, appellant's arguments regarding the letter of credit are not well-taken, and we conclude that the trial court correctly determined that the letter of credit was properly called.
As indicated above, the parties entered into a contract in April 1995 for the construction of public housing units and the eventual sale of such units to appellee. Construction began and in July 1996, the parties inspected the units. A punch list of necessary repairs was generated. By late November 1996, appellant had completed the items on the 1996 punch list, and it was noted that nine-month and twelve-month inspections would be performed.
On January 16, 1997, the closing on the contract occurred. At the closing, appellant supplied appellee with a letter of credit which, in essence, assured appellant would correct any defects within a one-year warranty period. The warranty period was one year from the date of the closing. The letter of credit, issued by Bank One, Columbus, N.A., expired on December 30, 1997.
After the closing, Carl Thomas, appellee's construction manager, noticed problems developing with the siding and described such condition as progressively deteriorating. He became concerned and discussed it with appellee's architect for the project, Gary Fischer. Mr. Thomas contacted the wholesaler of the siding, but it gave little help. Mr. Thomas did obtain the name of Royal's representative. Mr. Thomas, Mr. Fischer and Royal's representative met at the sites. On October 15, 1997, the Royal representative wrote Mr. Fischer and stated that the siding was "improperly installed, including improper nailing, no finished trim, panels cut too long, and applied over a foil-faced insulation which creates a heat trap."
On October 28 and 29, 1997, the nine-month inspection occurred and was attended by Mr. Thomas, Mr. Fischer and William Quinn, appellant's project manager. Mr. Quinn was given a copy of the Royal representative's October 15 letter. Mr. Quinn and Mr. Fischer took notes during the inspection. Mr. Fischer told Mr. Quinn that he would send a typed punch list. Mr. Fischer testified that appellant was mailed a copy of the punch list on October 30, 1997. However, Mr. Quinn testified that he did not receive the punch list, and he called Mr. Fischer in December 1997 because he had not yet received it. A punch list was faxed to Mr. Quinn on December 11, 1997. Mr. Quinn and Mr. Thomas spoke and decided not to begin the repairs from the punch list until after the holidays.
Between October and December 1997, Mr. Thomas had discussions with Mr. Neal regarding the expiration of the warranty period and the letter of credit. Mr. Thomas was concerned because there were serious problems with the siding and the warranty period was going to expire soon. He did not believe appellant could complete the punch list repairs before expiration of the warranty period, and he wanted some assurance that the project would be completed. Mr. Neal also testified that he was concerned with the impending expiration of the letter of credit and warranty period and the fact that the punch list repairs were not completed. Mr. Neal decided to call the letter of credit.
On December 18, 1997, Mr. Neal demanded full payment of Bank One pursuant to the letter of credit based on appellant's alleged default under the terms of the contract. By December 22, 1997, appellant was aware that appellee had called the letter of credit. Appellant began making the repairs on January 5, 1998. The record is clear that by the time of trial, all of the repairs had not been completed.
Appellee acted properly in calling the letter of credit in late December 1997. The contract stated, in pertinent part:
"2.10 WARRANTIES
"(a) [Appellant] shall promptly remedy any defects due to faulty materials or workmanship which may appear within the warranty periods and pay for any damage to other work resulting from such d efects. * * *
"(b) As assurance for the performance of [appellant's] obligations under paragraph (a) of this Section, [appellee] shall withhold from the Purchase Price an amount equal to two and one-half percent (2½%) of the Purchase Price. The withheld amount shall be used to pay the actual cost or expense necessary for performance of such obligations. Promptly after the expiration of each of the warranty periods, [appellee] shall pay to [appellant] any balance of such withheld amount not required for such performance, as determined by [appellee]. * * * As an alternative to withholding, [appellant] may furnish [appellee] with an unconditional and irrevocable letter of credit unconditionally payable upon demand of [appellee], issued by a banking institution in the same amount." (Emphasis added.)
The letter of credit stated, in pertinent part:
"We [Bank One] hereby establish this Irrevocable Standby Letter of Credit * * * in [appellee's] favor on behalf of Wallick Enterprises, Inc. * * * in the amount not exceeding One Hundred Nine Thousand Twelve and 00/100 U.S. Dollars * * * available by n egotiation of [appellee's] draft(s) at sight * * *.
"Additional Conditions:
"Partial drawings are permitted.
"* * *
"* * * [A]ll drafts drawn * * * will be duly honored upon presentation to the office listed above on or before our close of business December 30, 1997."
Under both the terms of the contract and letter of credit, appellee could, in essence, draw on the letter of credit at any time, unconditionally. The warranty provision of the contract states that appellant must promptly remedy any defects that may appear during the warranty period and as assurance of this obligation, appellant gave appellee a letter of credit which, under the terms of the contract and letter of credit itself, was unconditionally payable upon appellee's demand. This letter of credit expired on December 30, 1997. Thus, at the very least, appellee properly called the letter of credit on December 18, 1997, when the repairs stemming from the nine-month inspection had not yet been made and upon the reasonable belief that such repairs would not be made prior to expiration of the warranty period and the letter of credit itself.
Appellee could properly call the letter of credit, regardless of who was at fault for appellant allegedly not receiving the punch list until December 12, 1997 and despite the fact that the parties eventually agreed to begin the repairs in early January 1998. It is indisputable that defects due to faulty workmanship existed. The letter of credit was set to expire on December 30, 1997. Appellee properly called the letter of credit as an assurance of appellant performing its obligations under the contract. No provision required notice to appellant prior to calling the letter of credit, and no provision required that appellant be given the opportunity to extend the letter of credit.
Given all of the above, the trial court did not err in concluding that appellee properly called the letter of credit. Accordingly, appellant's second assignment of error is overruled.
Having overruled both of appellant's assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
KLATT and BOWMAN, JJ., concur.